CHARLES LUTTRELL v. THE STATE.

*No. 93.  Decided February 1.*

1. **Practice—Charge of Court—Conspiracy.**—It is the province of the court to determine, in a case involving that question, whether or not a prima facie case of conspiracy has been established; and if in the opinion of the court such issue arises from the evidence permitted to be introduced, then it is further the duty of the court to submit the issue of conspiracy or not, to be determined by the jury as any other issue in the case.

2. **Conspiracy, Proof of.**—Ordinarily a conspiracy is seldom proved by direct and positive testimony. Generally it is proved by circumstantial evidence; that is, by proof of facts from which it may be fairly inferred.

3. **Acts and Declarations of Coconspirator may be Proved, when.**—The acts and declarations of a coconspirator may be introduced in evidence before the conspiracy has been established, provided it be subsequently established by the other evidence in the case.

4. **Same — Charge of the Court.** — See facts stated in the opinion upon which it was *held*, that a prima facie case of conspiracy was established, and hence there was no error in admitting in evidence against the defendant the acts and declarations of his coconspirators, and especially so where the court submitted the question of conspiracy vel non to be found by the jury, and further instructed them that if they found a conspiracy was not established, they were not to consider these acts and declarations as evidence against the defendant.

5. **Charge of Court when not Excepted to — Acts and Declarations of a Number of Conspirators.**—On a trial for murder, where there was testimony admitted as to the acts and declarations of several supposed conspirators, and it was objected to the charge of the court that it permitted the jury to consider threats and declarations of all, while the evidence may not have shown *all* to be conspirators, *held*, that if the objection complained of be conceded, still, inasmuch as the charge was not excepted to, and no probable injury to defendant made to appear, all the parties having been shown to be coconspirators, defendant can not be heard to complain.

6. **Murder of First Degree.** — See evidence which in the opinion of the court was amply sufficient to support a verdict and judgment for murder of the first degree, with the death penalty.

APPEAL from the District Court of Grayson.  Tried below before Hon. T. J. BROWN.

This appeal is from a judgment of conviction for murder in the first degree, with the death penalty assessed. The indictment charged that appellant did, on the 28th day of April, 1892, with his malice aforethought, kill W. T. Sharman.

We produce, with some alterations, the following statement of the nature of the case and summary of the evidence, taken from the brief of appellant on file in this case.

Sharman was assassinated at his home in Denison during the night of April 27–28, 1892. He was shot while asleep in the same bed with his wife and their 3-year-old child. The weapon used was a shot gun loaded

with buck shot, of which twelve lodged in the body, three of them being imbedded in the backbone. Death was instantaneous. The only word uttered by the deceased after the shot was fired was the exclamation, " Mama !" Mrs. Sharman was asleep at the time, but was awakened by the explosion. A ladder, the end of which was wrapped with cloth, was found resting against the roof of the house near a window. The assassin had evidently stood on the ladder and fired the fatal shot over the upper sash of the window, which was lowered from the top. The murder was perpetrated on Thursday, April 28, between 2 and 3 o'clock in the morning. There was no light in the room, and the assassin made his escape unseen by any human eye.

The case for the prosecution rests upon circumstansial evidence and two alleged confessions of the defendant.

The theory of the State is, that the deceased was killed in pursuance of a conspiracy between the defendant and John T. Carlisle, Frank Fogg, and John Poe, instigated by J. M. Brown. Brown will be recognized as the noted turfman of Fort Worth, who was killed at Garfield Park, in Chicago, in October last. The motives imputed to the several parties named were, on the part of Brown and Carlisle, to get rid of a hostile witness in a pending murder case in Lee County; on the part of Fogg, friendship for Carlisle and a desire to aid him in putting the deceased out of the way; and on the part of the defendant Luttrell, that he was hired to do the murder. No motive on the part of Poe is suggested by the evidence.

On the 25th, 26th, and 27th of April the defendant and Fogg and Poe were in Denison. So far as appears, Carlisle was not in the town at the time of the homicide. He was in fact in Lee County at the time. Poe remained in Denison through the 28th, but the defendant and Fogg left for Fort Worth on the early train, which left at about 4:30 a. m. A heavy rain had fallen between the time of the murder and the arrival of the train, and witnesses at the depot observed that the shoes of both were muddy and their clothing wet. The condition of the clothing and shoes of the other persons at the depot does not appear. At Fort Worth the defendant was seen with a roll of money, which may have been $40 or $50, or more, according to the size of the bills, which the witnesses did not see. Defendant, who was a blacksmith, said he had won the money at gaming, and that he had a better thing than blacksmithing. He remained in Fort Worth until the 29th, when he left for Nashville, Tennessee, to enter the employ of J. M. Brown, whose race stock he had engaged to shoe.

In the course of the day of the murder, the barrels of a double-barreled shot gun, breech-loading, were found within a few hundred yards of Sharman's house, on one of the roads leading to the Union depot; and at another point, several hundred yards distant from the first, the stock

of a gun of similar make was found. One of the barrels contained a cartridge loaded with buck shot. The other contained an empty shell, which had been freshly discharged. The shot in the loaded cartridge corresponded in size with balls cut from the body of the deceased. The two parts of the gun fitted together, and were identified by several witnesses as a gun which belonged to Carlisle, and which he had sent by express to the defendant at Denison. The defendant receipted for the gun on the 31st of March, 1892, and afterward pawned it with the witness O'Malley, subsequently redeeming it on the 26th of April. There was no concealment of his connection with the gun, but, to the contrary, the necessary papers were in each instance signed with his own name in full, Charles Luttrell, and his whole connection with the gun was freely told by him to Sheriff McAfee and Policeman Hackney, after he had been warned that any statements made might be used against him, but not for him. Neither was there any apparent effort to hide the gun barrels and stock, which were openly, not to say ostentatiously, exposed at the places where they were thrown by the assassin in his flight.

There was no direct positive evidence of any plot to kill the deceased between the defendant and his alleged coconspirators. The only occasions on which they were seen together were as follows:

About the first of April the defendant took supper with Fogg at Mrs. Moorfield's, in Denison. About the same date Fogg introduced defendant to the witness Hawkins at Fort Worth. Defendant was hunting a job of work at the time.

Dick Harrison, an employe in Lee's restaurant in Fort Worth, testified, that Carlisle took breakfast at the restaurant alone on Saturday, April 23; that on the same day he took dinner there with Fogg, and supper with both Fogg and defendant, and also breakfast and dinner on Sunday, April 24. On these several occasions the parties held conversations with each other, which the witness did not hear, and the defendant Luttrell wrote one or more letters; but the purport of neither conversations nor letters appears.

In the early part of the night on which Sharman was killed, in passing defendant's room, the witness Moore saw Poe and another person whom he did not recognize in the room. Just as witness passed, the door was closed. There was a light in the room at the time.

On the same evening the witness Brockman saw the defendant hand Fogg a package, which Fogg put in his pocket. They walked past the corner, and had a brief conversation. The package was such as could be held in one hand. The same witness had seen the defendant in conversation with J. M. Brown, in Fort Worth, about two or three weeks, possibly four or five weeks, before the killing.

From this summary, which is believed to be accurate, it appears that the defendant was only seen with Poe on one occasion; he was seen with

Fogg alone twice; and with Fogg and Carlisle together three times. Poe and Carlisle were never seen together; nor Poe and Fogg; and at no time when defendant was present was the name of Sharman mentioned.

To this summary it is proper, perhaps, to add the fact that the gun was sent to the defendant by Carlisle from Lebanon, Collin County; and that the defendant's evidence showed that he had received letters from Brown and Fogg offering him employment to shoe Brown's race stock.

The State was permitted to introduce evidence, over defendant's objection, tending to show that each of the parties had a motive and a purpose to murder deceased, and testimony was allowed relating to the acts and declarations of the other parties in the absence of the defendant.

The evidence discloses that the defendant resided in the Indian Territory. He had come to Texas in March, 1892, under a contract to shoe race horses for Brown, who lived in Fort Worth, but was then in Memphis, Tenn. The contract was made by correspondence between defendant and Brown and Fogg. On reaching Fort Worth, the defendant found that Brown would not need him until about the first of May. He then sought work in Fort Worth and in Denison, where he is shown to have had business. While in Denison, about the last of March, he visited the shop of the deceased, who was also a blacksmith, ostensibly in search of work. Being unsuccessful, he returned to Fort Worth, and from there went to Vernon, Wilbarger, County, where he remained, working at his trade, until Saturday, April 23, when he again returned to Fort Worth, and remained until Monday. On Monday, the 25th, he went to Denison, where he remained until the morning of the fatal 28th, going from there to Fort Worth, and thence to Nashville, Tenn. On his last visit to Denison, just before the murder, he does not appear to have visited Sharman's shop, or to have seen or inquired for him. He saw Poe but once, and Fogg once, on the evening before the killing, as already detailed.

Under the ruling of the court, to the effect that a prima facie case of conspiracy had been shown, the following evidence tending to incriminate Carlisle, Fogg, and Poe was then admitted, over defendant's objection.

Scarborough, sheriff of Lee County, testified: That in February, 1891, he had arrested Carlisle and put him in jail, where he remained two or three months. He was under indictment for the murder of one Sam Sparks, committed in 1880. Witness arrested him a second time in December, 1891. One Ed Myers was jointly indicted with him. Myers was tried and convicted in 1888. Witness was present at the trial. Sharman was a witness for the State, and was the only eye-witness to the killing. There was a deadly enmity between Sparks and J. M. Brown. Brown was sheriff of Lee County at the time Sparks was killed, and Myers was his deputy. Carlisle and Brown left Lee County in 1886. Witness did not see Carlisle afterwards until February, 1891, when he arrested him at Hot Springs, Arkansas. Brown was at Hot Springs at the time.

Carlisle was a blacksmith when Sparks was killed, and Sharman worked in the shop with him at the time and for several years after. Carlisle's case in Lee County was set for trial on May 2, 1892, and an attachment had been issued for Sharman as a witness in the case and had been sent to the sheriff of Grayson County at the time of Sharman's death.

McAfee, sheriff of Grayson County, testified: That in the fall of 1891 he took the deceased, Sharman, to Lee County as an attached witness in the case against Carlisle. Witness had an attachment for him in the same case at the time of his death. Witness promised to come for him and take him to Giddings. Sharman told him he was glad to hear it; that he was afraid of W. E. Jones.

M. Spradling testified: That Carlisle had spoken to him of the case against him at Giddings, Lee County; that Carlisle told him if he could get Sharman out of the way he could beat the case. This was about a week before Sharman was killed. Carlisle was then living at Lebanon, Collin County, where he passed under the name of John Thomas.

Henry Carlisle testified: That a few days before Sharman was killed, as Carlisle was about leaving Lebanon for Giddings to attend his trial, witness asked him how he thought he would come out. Carlisle said he did not know; that they might hang him; that if it was not for the testimony of Sharman he would come out all right. He finally dismissed the subject with the remark, "We have started out to beat this thing, and if we can't beat it one way we will another."

To other witnesses Carlisle made similar statements, showing the strongest motive and desire that Sharman should be put out of the way.

S. P. Taylor, a partner of Sharman's in the blacksmith business, testified: That in the fall of 1891, Carlisle came to the shop several times to see Sharman, having other parties with him. On one occasion he tried to induce Sharman to go outside the shop with him, but Sharman refused; they went to the back part of the shop and held a conversation, in the course of which Carlisle told Sharman that if he told something, witness did not understand what, it would be a " damned stinking lie;" and if he swore it, he, Sharman, would go "over the road" instead of him, Carlisle.

J. W. Fox was brought out of the Lee County jail to testify. He was charged with conspiracy to murder Deputy Sheriff Sparks, a brother of the Sparks who was killed in 1880. He testified that in February, 1891, Carlisle had tried to hire him to kill Sharman and Sparks. Carlisle told witness that if Sharman lived he, Carlisle, would have to go to the penitentiary; but that his attorneys at Giddings had told him that if Sharman was out of the way, it would settle the case; that he had a friend in Memphis who would pay $500 to have Sharman killed and $3000 for Sparks; that his Memphis friend was afraid Sparks would keep stirring things,

Vol. XXXI. Crim.—32

until he, the Memphis friend, was implicated in it; that Carlisle afterward told him the "Sharman job" was "fixed." Carlisle did not tell him the name of his Memphis friend, but said he was a big turfman, whose family lived at Fort Worth. Brown was, of course, the party referred to.

On the same theory of conspiracy, the following incriminating evidence against Fogg was admitted:

Dick Harrison testified, that on the evening of Sunday, April 24, at Lee's restaurant, in Fort Worth, in speaking to witness and Lee about Carlisle's case at Giddings, Fogg said that Carlisle was as innocent as a new-born babe, but that Sharman was going to swear his life away, and that unless something was done Carlisle would hang; that Sharman had been picked up by Carlisle; that Carlisle had taught him a trade and had made a man of him, and that he ought to be killed.

B. C. Evans testified, that Fogg told him on Monday, the 25th of April, that he was going to Denison the following night.

The following evidence, tending to incriminate Poe, was received, over defendant's objection:

N. B. Kinder testified, that he saw Poe in Denison on the Monday before the killing. Witness saw him again about dark the night before the killing. He was at the time just stepping off the south end of the viaduct, going south. Sharman lived south of the viaduct.

Mike Sweeney, a saloon keeper, testified, that on Monday, the 26th, he saw Poe looking at the Denison City Directory in witness' saloon.

Taylor, Sharman's partner, testified, that on Monday, April 26, Poe, claiming to be a stockman, had a pair of clamps made at Sharman's shop. He was at the shop twice—once in the morning, when he ordered the clamps, and again at 5 o'clock in the evening, when he got and paid for them.

D. S. Beck testified, that at about 10 a. m. of April 27, he saw Poe south of the viaduct, about one-half block from Sharman's residence. Witness was going north at the time and Poe was coming south. He said he was looking for some lots that belonged to Taylor. He spoke of Taylor and Sharman, and said they were fine blacksmiths. He exhibited a pair of clamps which Sharman had made, and said it was a good job. About an hour later witness met Poe, who was going north and the witness south. They met about two blocks from Sharman's residence. After some few remarks, Poe asked if Sharman did not live in that neighborhood, and where he lived. Witness pointed out Sharman's house to him.

Mrs. Davis, proprietress of the Bon Ton restaurant, testified, that Poe occupied a room at the hotel Monday, Tuesday, and Wednesday, April 25, 26, and 27. On the first night he occupied a room alone; the following night he expressed a wish for cheaper lodgings, and was assigned to a room with the witness Giles and one McCartney. When he first came

he deposited a valise with witness in the office. He also deposited $96 in money. On Wednesday evening, before the killing, he called for the valise, took out a pistol and then returned the valise. On Thursday morning, after the killing, he again called for the valise, replaced the pistol and returned the valise to witness. The room occupied by Poe on Wednesday night opened on the street, and one could go from the room to the street without passing through the office.

F. W. Giles, who occupied the same room with Poe and McCartney, testified, that on Wednesday night no one was in the room when he retired. He got up at 5:30 Thursday morning, at which time no one was in the room but McCartney.

This comprises substantially the whole of the State's case, except the two confessions made to the witnesses Robinson and Jones.

F. W. Robinson testified, for the State: I live at Orange, Texas. I spend much of my time at Lake Charles, Louisiana. I know the defendant. I first met him at Lake Charles, Louisiana, in last June. He introduced himself to me. I saw him there off and on until in July. I had several conversations with him. Defendant said he lived in the Indian Territory. The first time I had a conversation of any length with defendant he wanted me to let him have $300, and take an order for $300 that he had owing to him in the Indian Territory. He said that he could not get the money owing to him in the Indian Territory because, he said, he was on the "dodge." I refused to let him have the money. He took from his pocket a Dallas News, containing an account of the arrest of Frank Fogg for the murder of W. T. Sharman. He said he had run from Denison on account of the Sharman killing. Defendant told me that he had killed Sharman; and told me how he did it. He said, that two or three weeks before Sharman was killed he had tried to get a chance to kill him, but failed. That he hid in the privy at Sharman's place, thinking that Sharman would come out, but that instead of Sharman coming, Sharman's wife came, and he had to run off. That on the night of the killing he muffled the end of a ladder, and placed it on the roof of Sharman's house over a window of his bed room; that the window was lowered a little from the top; that he then got on the ladder and shot him over the window sash. That he ran away from the house, and when he was 300 or 400 yards from the house, he broke the gun and threw it away. Defendant was passing by the name of John Wilson when he was at Lake Charles.

I have known Frank Fogg. I know J. M. Brown; have had business dealings with him. I don't know Carlisle or Poe. I have known Captain W. E. Jones five or six months. I have talked to W. E. Jones about this case. I first talked to him about it in Chicago, before defendant was arrested. I was attached as a witness in this case at Orange. I corresponded with J. M. Brown about Luttrell after I met him. I know Nat

Wasey. I know where Kinder's saloon, Touche's saloon, and Cora's house of ill-fame in Lake Charles are. I heard of a foot race between Day and Vinson in Lake Charles sometime about the middle of July. I did not have any conversation with Wasey the day before the foot race; was not in Touche's saloon that day. I never made any agreement with Wasey to get defendant out and waylay and kill him. I was not in Lake Charles the day before or the day of the foot race. I was in Lake Charles from the 1st to the 20th of June. I was in Chicago by the 25th of June. I was not in Fort Worth in June, and did not see Jim Brown there. I never talked to Fogg in the Fort Worth jail. I don't think I was in Giddings in June. I was in Giddings in July. Defendant told me that there was a man with him when he killed Sharman, but he did not mention his name. I never proposed to defendant to kill Scarborough.

W. E. Jones testified, for the State: I live in Gonzales; used to be the sheriff of that county. I know the defendant. I saw him in September. I arrested him in this case. I had a writ for his arrest in this case when I first met him, but I talked to him three or four hours before I arrested him. Defendant thought I was his friend when he saw me. I had a talk with him about the killing of Sharman. I introduced the subject. Defendant told me that Fogg had a gun expressed to him; that he got the gun out of the express office. That on the night of the killing he went to Sharman's house, put a ladder on the house by a window in Sharman's bed room, got on the ladder, and shot him through an open window. That Sharman's wife and child were sleeping in the bed with him at the time. That Sharman spoke but one word—" Mama! "—after the shooting. That after he left the place he broke the gun and threw the pieces in different places. That he had understood that these pieces had been found. That soon after the killing he got a similar one and left it in the Territory, so that he could account for the one that Fogg sent him. I asked him who was with him when he killed Sharman. He first said Fogg. I asked him if that was so. He said, " Well, as everybody suspects Fogg, and as long as they suspect the wrong man, they are not apt to get the right one; so let it be Fogg." He afterward told me that Poe was with him.

I was specially deputized to arrest Luttrell in this case at the time I had the talk with him. I was looking for Luttrell, and first saw him several miles from Gonzales. He went with me to my home in Gonzales, and when there I arrested him. I put him in jail at Gonzales. I accompanied the Grayson County officers with Luttrell as far as San Antonio. I rode on the seat with Sheriff McAfee. Hackney and defendant were on a seat in a different part of the car, and I did not hear anything that was said between them. Luttrell had some letters on him when I arrested him. He told me to burn them.

*Bassett, Seay & Muse,* for appellant, filed an able and most elaborate and interesting brief in the case, from which we extract, after stating their general grounds for reversal, the several propositions and authorities considered and discussed by the court in its opinion delivered in the case.

The propositions stated by them, in full, and upon which they relied for reversal, are as follows:

1. Because of the error in overruling the motion to quash the return on the special venire.

2. Because of errors in the charges on alibi and the reasonable doubt.

3. Because of the failure to instruct as to the law of accomplice testimony.

4. Because no sufficient evidence of conspiracy was produced to authorize the submission of that issue to the jury.

5. Because of errors in the charge relating to conspiracy—

(1) In authorizing, or apparently authorizing, the jury to consider the declarations and acts of the alleged coconspirators in determining whether there was a conspiracy.

(2) In instructing, in substance, that the agreement to kill would be sufficiently proved if the proof showed that each of the alleged conspirators performed some part or act contributing to the common design, and in not instructing that to produce that result such part or act must have been knowingly performed.

(3) In instructing the jury, in substance, that in this case, in which defendant Luttrell alone was on trial, the complicity of each of the other alleged conspirators could be established by his own admission, under which charge the jury may have considered against the defendant the acts and declarations of parties whose connection with him was not otherwise shown than by hearsay evidence.

(4) In instructing the jury, in substance, that if a conspiracy to kill had been shown between the defendant and either Carlisle, Fogg, or Poe, that they might consider against the defendant the declarations and conduct of each of the others, even though no evidence of conspiracy was produced against such other.

1. The court erred in admitting in evidence, over defendant's objection, the acts and declarations of defendant's alleged coconspirators, Carlisle, Fogg, and Poe, done and made in the absence of the defendant, because no sufficient predicate therefor had been laid; and in submitting to the jury the issue of a conspiracy, because the evidence was insufficient to establish the same.

(1) The evidence was insufficient to authorize the submission to the jury of the issue of conspiracy.

(2) The evidence of the acts and declarations of the alleged coconspirators was reasonably calculated to, and doubtless did, greatly prejudice his case with the jury.

2. The language of the third charge, in which the issue of conspiracy was submitted to the jury, was erroneous and misleading.

(1) The first paragraph of the third charge is complained of as a charge upon the weight of the evidence, the tendency of the language used being to impress the jury with the belief that in the opinion of the judge the theory of conspiracy was established by the evidence; and was, moreover, erroneous and misleading, in that it did not confine the jury to the consideration of the aliunde evidence of conspiracy, but apparently authorized them to consider the acts and declarations of the alleged coconspirators in aid of such evidence aliunde. The paragraph in question reads as follows: "I have admitted acts and declarations of J. F. Fogg, John T. Carlisle, and John Poe, on the theory that they were coconspirators with the defendant; but the act of the court in admitting this evidence means only that sufficient evidence of the conspiracy was offered to permit the testimony to go to you, for you to determine from the evidence whether in fact there was such conspiracy; and you will, under the evidence and following charges, determine whether or not such evidence should be considered by you against the defendant."

(2) A portion of the second paragraph of the third charge, relating to conspiracy, was erroneous and misleading, in that the jury may have understood its meaning to be that a participation on the part of the defendant in the alleged conspiracy would be shown by his performance of some part or act which contributed to the accomplishment of the death of the deceased, although such participation may have been without a knowledge of the purpose to kill of the other alleged conspirators. The part of the charge herein complained of reads as follows: "It is not necessary for the State to prove that the parties actually met together and made the agreement to kill; it is sufficient if the evidence shows that they performed different parts or acts, all contributing to the accomplishment of the common design."

(3) So much of the third charge as undertook to instruct the jury under what circumstances they might consider the acts and declarations of the other alleged conspirators as evidence against the defendant was erroneous and misleading, inasmuch as the jury may have understood, and probably did understand, the meaning of the charge to be, that the admission of either of the alleged conspirators that he was a party to the conspiracy would be competent evidence of the fact against the defendant in this case, and if they were satisfied of this fact from such admission, they might then consider the acts and declarations of such party against the defendant. The portion of the charge complained of is as follows: "The fact of conspiracy can not be proven by the declarations of any of the conspirators—that is, except as to the one making the declaration; but when the fact of conspiracy has been established by competent and satisfactory evidence, the acts and declarations of any one of the

coconspirators are admissible in evidence against any party to the agreement.''

3. That part of the fourth charge which undertook further to instruct the jury on the issue of conspiracy was erroneous, in that it was calculated to lead them to believe that if a conspiracy on the part of the defendant and either Carlisle, Fogg, or Poe was shown, they might consider as evidence against the defendant the acts and declarations of the others, although the jury might believe that no conspiracy with such others was shown. The portion of the charge complained of is as follows: "If you believe from the evidence that the defendant, Charles Luttrell, entered into a conspiracy (as defined in paragraph 3) with Fogg, Carlisle, and Poe, or either of them, to kill Sharman, then you may consider as evidence against the defendant any acts or declarations of * * * Fogg, * * * Poe, and * * * Carlisle, or either of them, which may have been detailed in evidence before you.'' And said error was reiterated and emphasized when in a subsequent portion of the same paragraph they were instructed under what circumstances they would be authorized to discard from their consideration such acts and declarations of the other parties named, as follows: "If, however, the evidence does not satisfy your minds beyond a reasonable doubt that the defendant, Charles Luttrell, did enter into the agreement with * * * Fogg, * * * Carlisle, and * * * Poe, or either of them, to kill * * * Sharman, then you will discard from your consideration all acts and declarations of said Fogg, Carlisle, and Poe, or either of them.'' Holmes' case, 9 Texas Ct. App., 313; Jones' case, 28 Texas Ct. App., 42; Tittle's case, 30 Texas Ct. App., 597.

4. The charge of the court was erroneous, misleading, and defective, in failing to instruct the jury as to the law of accomplice testimony, the evidence having a tendency to show that the witnesses Robertson and Jones stood in the attitude of accessories, so as to require their testimony to be corroborated. Willson's Crim. Stats., secs. 156, 2449, 2450, 2345.

*R. L. Henry,* Assistant Attorney-General, for the State, also filed an able and elaborate brief in the case, from which we extract the following propositions and authorities pertinent to the issues decided by the court in the opinion:

1. The court properly admitted the declarations of Fogg, Poe, and Carlisle. The existence of the conspiracy was proven. A conspiracy can be established by circumstantial evidence. Smith v. The State, 21 Texas Ct. App., 120; Harris v. The State, ante, 411.

2. The court did not charge the law of accomplice testimony as to the evidence of the witnesses Jones and Robinson. The evidence fails to show that either of said witnesses, by any unlawful act or omission on

his part, at any time was in any way connected with the murder of Sharman, and such an instruction would have been improper.

Nor did the court err in failing to instruct the jury, that if appellant was an accomplice under article 79, Penal Code, he could not be convicted as a principal. Under all the evidence, except the appellant's own testimony, he is a principal in the crime, or nothing. In appellant's testimony in his own behalf he disclaims any knowledge that a crime was to be committed, and hence fails to raise the issue of his being an accomplice.

3. It was incumbent on the court to submit the law as to the declarations of Fogg, Carlisle, and Poe, under the facts of this case, as coconspirators, and we submit that in calling the attention of the jury to this evidence paragraph 3 of his charge is not upon the weight of the evidence.

4. The court correctly told the jury, in paragraph 3 of his charge, " It is not necessary for the State to prove that the parties actually met together and made the agreement to kill. It is sufficient if the evidence shows that they performed different parts or acts, all contributing to the accomplishment of the common design."

It is difficult to see, as contended by appellant, how the parts or acts could have been done contributing to the accomplishment of the common design without knowledge on the part of the actors. A conspiracy can be thus shown. Smith v. The State, 21 Texas Ct. App., 120.

HURT, PRESIDING JUDGE.—On the night of April 28, 1892, W. T. Sharman was assassinated at his home in Denison, Grayson County. He was shot while asleep in the same bed with his wife and a 3-year-old child. The weapon used was a shot gun, loaded with buck shot, a number of which lodged in the body of deceased. Death was almost instantaneous. The only word uttered by him after the shot was " Mama." A ladder, the end of which was wrapped in cloth, was found resting against the roof of the house, near a window. The assassin had evidently stood on the ladder, and fired the fatal shot over the upper sash of the window, which was lowered from the top. There was no light in the room, no eye-witness to the dastardly deed, and the murderer escaped unseen. That the homicide was a cold-blooded, premeditated murder is evident.

Appellant, Charles Luttrell, was indicted for the homicide, and on the 25th day of October, 1892, was tried and convicted of murder in the first degree, and the death penalty was assessed. Judgment being entered on the verdict, he appeals to this court.

Was appellant the real assassin? Has the State shown by competent, legal evidence, with a correct application of the law thereto, that appellant was the murderer beyond a reasonable doubt, or to this court to a reasonable certainty? If so, then this judgment should be affirmed.

Counsel for appellant, with great force, contend, (1) that incompetent

evidence was, over his objections, admitted against him, in this, that the acts and declarations of Carlisle, Fogg, and Poe, done and made in his absence, were not competent evidence, because no conspiracy had been shown; (2) that there was error in the charge submitting to the jury the issue of conspiracy, because conspiracy was not shown by the evidence. If a conspiracy between Carlisle, Fogg, Poe, and appellant was prima facie shown, the acts and declarations of Carlisle, Fogg, and Poe, done and made in furtherance of the common design, and pending the conspiracy, were competent evidence against appellant. Whether a prima facie conspiracy was established was a fact to be determined by the court. On the other hand, if such conspiracy was sufficiently shown to warrant the court's action in admitting the acts and declarations of Carlisle, Fogg, and Poe, then, evidently, there was no injury done appellant by the court in submitting the issue of conspiracy vel non to the jury. Why? Because notwithstanding the court may have been justified, from the evidence, in believing that such a conspiracy had been shown, still the fact of conspiracy being submitted to the jury, they might have taken another view of the evidence relied upon to establish it, failed to believe it had been established, and rejected all of the acts and declarations of Carlisle, Fogg, and Poe. It was the duty of the court to submit this issue to the jury. Appellant, on the issue of conspiracy, had two chances—first, with the court, and finally, with the jury. If, however, the conspiracy was not shown, the error of the court in admitting the acts and declarations of Carlisle, Fogg, and Poe was not cured by submitting the issue of conspiracy to the jury. The question, therefore, is, was the conspiracy sufficiently shown to warrant the court in admitting in evidence the acts and declarations of the supposed conspirators?

A conspiracy is proved either expressly or by the proof of facts from which it may be inferred. It is seldom proved expressly, nor can a case be easily imagined in which that express proof is likely to occur, unless a person implicated in the conspiracy consents to be examined as a witness for the prosecution. In nearly all cases, therefore, the conspiracy is proved by circumstantial evidence, namely, by proof of facts from which the conspiracy may fairly be inferred. The acts and declarations of a conspirator may be introduced in evidence before the conspiracy is established, but the conspiracy must be proved. Was it shown in this case? Eliminating the voluntary confessions of the appellant, made calmly and deliberately, to Robertson and Jones, the proof of conspiracy would, we think, be sufficient; and when viewed in the light of these confessions, the proof of conspiracy becomes clear, and we think very cogent—at least sufficiently strong as to create a prima facie case of conspiracy; and hence there was no error in admitting in evidence the acts and declarations of Carlisle, Fogg, and Poe.

The charge of the court relating to the admission in evidence of the acts and declarations of Carlisle, Fogg, and Poe is objected to. The objectionable paragraph reads: "I have admitted before you evidence of acts and declarations of J. F. Fogg, John Poe, and John T. Carlisle, upon the theory that they were coconspirators with defendant; but the action of the court in admitting this evidence means only that sufficient evidence of the conspiracy was offered to permit the testimony to go to you, for you to determine from the evidence whether there was in fact such conspiracy." This paragraph of the third charge is objected to, "because it impressed the jury with the belief that in the opinion of the judge the theory of conspiracy was established by the evidence." When read with the remainder of paragraph 3 of the charge, there is no error. On the contrary, it was the duty of the judge to tell the jury that though he had received the evidence (acts and declarations of conspiracy), yet they had the right to determine whether in fact a conspiracy had been established, and if not established, not to consider as evidence against the appellant the acts and declarations of Carlisle, Fogg, and Poe. This duty was performed in plain and simple language, which could not have been misunderstood by the jury.

The remainder of the third paragraph of the charge reads: "If two or more persons enter into an agreement to kill any reasonable creature in being in this State, this in law constitutes a conspiracy to commit the crime of murder, and all parties to such agreement are coconspirators. In order to constitute a conspiracy, there must be a positive agreement to commit the crime—that is, to do the act of killing. It is not necessary for the State to prove that the parties actually met together and made the agreement to kill. It is sufficient if the evidence shows that they performed different parts or acts, all contributing to the accomplishment of the common design. The agreement to commit the crime may be proved by circumstantial evidence, in like manner as other facts may be proved by such evidence, and to be governed by the same rules as are prescribed in the seventh paragraph of this charge for determining the sufficiency and conclusiveness required in cases depending upon circumstantial evidence. The fact of conspiracy can not be proved by the declarations of any one of the conspirators—that is, except as to the one making the declarations; but when the fact of conspiracy to commit a crime has been established by competent and satisfactory evidence, the declarations and acts of any one of the coconspirators are admissible in evidence against any of the parties to the agreement, for the purpose of establishing the commission of the crime. But to be admissible for such purpose, such acts must have been done and such declarations made during the pendency of the conspiracy, and in the furtherance of the accomplishment of the common purpose—that is, such acts must have been performed and

declarations made after the agreement to commit the crime was entered into, and before the crime was committed.''

Appellant complains of the fourth charge, because it permitted the jury to hear and consider as evidence against appellant acts and declarations of Poe, Fogg, and Carlisle, when the evidence may not have shown them all to be conspirators. The charge complained of is as follows:

'' If you believe from the evidence that the defendant, Charles Luttrell, entered into a conspiracy (as charged in paragraph 3 of this charge) with J. F. Fogg, John T. Carlisle, and John Poe, or either of them, to kill W. T. Sharman, then you may consider as evidence against defendant any acts or declarations of J. F. Fogg, John Poe, and John T. Carlisle, or either of them, which have been detailed in evidence before you. But to be so considered by you, such acts must have been done and such declarations must have been made in the furtherance of the common purpose, during the pendency of such conspiracy, if you believe there was such conspiracy. If, however, the evidence does not satisfy your minds, beyond a reasonable doubt, that defendant, Charles Luttrell, did enter into an agreement with J. F. Fogg, John T. Carlisle, and John Poe, or either of them, to kill W. T. Sharman, then you will discard from your consideration in this case all the acts and declarations of the said Fogg, Carlisle, and Poe, or either of them, that have been placed in evidence before you. If you believe that defendant did enter into such conspiracy, as aforesaid, with Fogg, Carlisle, and Poe, or either of them, to kill W. T. Sharman, but do not believe from the evidence that the declarations and acts of said Fogg, Carlisle, and Poe, or either of them, or that any act or declaration of either of said parties in evidence before you, was done or made in the furtherance of the common purpose, and during the pendency of said conspiracy, if there was a conspiracy, then you will discard all such acts and declarations of either of said parties in evidence before you as does not come within these requirements.''

When we consider the charge as a whole, it is very questionable whether it is obnoxious to the above objection. But concede the objection, there being no exception reserved at the time, was there probable injury resulting from the failure of the judge to nicely guard this point by instructing the jury not to receive as evidence the acts or declarations of the party not shown to be in the conspiracy? We are of opinion there was no injury resulting to defendant, because the evidence clearly shows them all coconspirators with defendant.

We have not written upon all the questions presented in argument and brief for appellant, but we have given them careful attention. We have to say of this case, that appellant has had a fair trial in all particulars. The learned judge who presided was remarkably careful, used great pains to secure to him all legal rights, and to guard him against injury from

every source.   If Jones and Robertson are worthy of belief, he is evidently guilty of willful, deliberate, and premeditated murder, and should suffer the extreme penalty of the law; and the judgment is affirmed.

*Affirmed.*

Judges all present and concurring.