## JIM MOORE v. THE STATE.

### No. 2324. Decided May 7, 1902.

**1.—Murder—Conspiracy to Rob—Charge of Court.**

On a trial for murder, where the State's theory was that defendant and two confederates had formed a conspiracy to rob deceased, and that deceased was killed in an outhouse, and an attempt made to burn his body; and the State introduced the confessions of defendant, which showed that deceased had insulted· defendant in said outhouse and that defendant had beat and choked him, leaving him alive in said house. Held, this state of facts did not sustain the theory of a murder in the perpetration of robbery or theft; but, if a murder at all, it was brought about by the insulting conduct of deceased towards defendant, and the law in regard to such state of case should have been submitted in the charge of the court to the jury.

**2.—Same.**

If there was a conspiracy to rob or murder deceased, but the killing occurred in a fight between deceased and defendant, and not in pursuance of the conspiracy, then defendant could not be guilty of murder in the pursuance of a conspiracy to rob or murder deceased.

**3.—Same.**

If deceased was alive when defendant left the outhouse, and his death was due to any other cause than the act of defendant, then defendant would not be guilty of any phase of homicide; and these matters should have been distinctly charged upon by the court.

**4.—Same—Conspiracy—Charge of Court.**

On a trial for murder where the court, with regard to the State's theory of a conspiracy, charged the jury as follows, viz: "The court has admitted before you evidence of the acts and declarations of C., H. and D., upon the theory that they were coconspirators with defendant Moore, but my action in admitting this evidence means only that sufficient evidence of the conspiracy was offered to permit the evidence to go before you for you to determine from all the evidence whether there was in fact such conspiracy," etc. Held, a charge on the weight of evidence. Following, Hudson v. State, 43 Texas Crim. Rep., 420. Henderson, J., dissents, and cites contra, Luttrell v. State, 31 Texas Crim. Rep., 493. [See this paragraph of the court's charge set out in full in the statement of the case below.—Reporter.]

Appeal from the District Court of Fannin. Tried below before Hon. Ben H. Denton.

Appeal from a conviction of murder in the second degree; penalty, ninety-nine years imprisonment in the penitentiary.

This is a companion case to Hatcher v. State, 43 Texas Crim. Rep., 237. The indictment, which was similar to that in the Hatcher case, charged appellant alone with the murder of John Johnson, on the 23d day of December, 1900.

The statement of facts is most voluminous, but the following, taken from the written argument on file of James G. Dudley, of counsel for appellant, is reproduced as substantially correct: The record shows that three parties were charged with this murder—Charley Hatcher, Paul Dorsey and Jim Moore, the appellant. Hatcher was much older than either Dorsey or Moore, while Dorsey was several years Moore's senior, the latter being a minor about 20 years old. Hatcher was a transient person, having been in Fannin County only a short time. Dorsey likewise had been in the county only a year or two, while Moore had been raised in the county. His father dying when he was quite young, he continued to live with his widowed mother on a small farm

near the little town of Gober, and at the time of the alleged murder had entire charge of his mother's business, including her money, which was deposited in a Bonham bank to his account.

The deceased and appellant had always been friends, lived near each other, and appellant's character for honesty and uprightness was good, unquestioned and unquestionable.

It was near Christmas, Saturday night, the 22d of December, 1900, when a large number, almost the entire male population in and around Gober, met at Tom Fittswaters' place of business, a local option dive, and proceeded to "tank" up on local option bitters, make merry in anticipation and in honor of the birthday of Jesus of Nazareth, and play a little draw poker "for revenue only." Hatcher, Dorsey, the deceased (Johnson), and one Bill Jones and the appellant, among others, were in the crowd and participated in the game. The poker game was broken up by the proprietor, Fittswaters, some time before the crowd dispersed, the deceased insisting on playing. After the game stopped the deceased exhibited his money and had it counted by Fittswaters several times in the presence of the crowd, the last time only a few minutes before the crowd left Fittswaters' place of business (when appellant insisted that Fittswaters should take care of and keep this money), and he had about $40 or a little more, consisting of greenbacks, silver and some change.

Late that night (the witnesses varying from 12 to 1:30 or 2 o'clock) Fittswaters closed his place of business and the crowd left, the deceased and the appellant going off together in the direction of deceased's home, being also in the direction of appellant's home; the appellant, considerably under the influence of drink, had a quart bottle of whisky. The deceased, much under the influence of drink, had a bottle of local option bitters. About one hundred and fifty or two hundred yards from Fittswaters' place, Hatcher, Dorsey and Bill Jones came up and assisted appellant in carrying the deceased along the big road towards his home, the deceased having by this time become so drunk that he could not walk. The night was cold, and when the party carrying the deceased reached a vacant house about one-half or three quarters of a mile from Fittswaters' place, and standing just a few feet from the side of the big road, they took the deceased into this house and built up a fire in the fireplace to keep him warm. Bill Jones stayed about twenty minutes and left. Hatcher, Dorsey and appellant were at the office of Dr. Bridge, in Gober, at a quarter past 4 o'clock on the morning of December 23d, where appellant's hand, which had been cut by striking a glass window, was dressed, and they remained there until a little before daylight.

Appellant, being very drunk, gave his money to Dr. Bridge, and continued to drink whisky out of a bottle, while Hatcher and Dorsey pretended to drink out of the bottle, or feigned drinking, insisting that appellant keep his money and not give it to Dr. Bridge. It was shown that appellant left home on the 22d with more money than he gave Dr.

Bridge, a part of it of the same kind and denomination as that given to Dr. Bridge.

Appellant in his own behalf testified that when Hatcher, Dorsey and himself left the vacant house to go to Dr. Bridge's office to get his hand dressed, they left the deceased alive and unhurt, lying in front of the fireplace asleep. On the examining trial of defendant, Dorsey, testified to the same thing. On the trial of Hatcher, Dorsey admitted that he did so swear at the examining trial, but said he knew it was a lie when he swore it, and gave as his reason for so swearing falsely that he had not at the examining trial closed a contract with the State securing immunity from prosecution and punishment in consideration of his testifying for the State. On the trial of this case Dorsey denied making such admission and statement on the trial of Hatcher, and was impeached by the testimony of a number of witnesses including the judge who presided at the Hatcher trial, and the State introduced a purported confession or admission of appellant to the sheriff, in which appellant stated among other things that deceased, John Johnson, was alive and asleep in front of the fire place when he in company with Hatcher and Dorsey left the vacant house.

What became of Bill Jones after leaving that vacant house that morning we do not know, except from his own admissions. He says he stayed in a cotton pen the balance of that cold night, went to a pool of water the next morning, washed his face, then got him some eggs, and like a child of the desert, stole off to a barren heath and cooked and ate them. It is certain that he did not go home, or to the place where he was to work. He had been following the deceased from the time the deceased sold his cotton in the evening; he saw the money for the cotton paid deceased. He had insisted on taking the deceased home or going home with the deceased, after deceased had told him that he did not want him to go with him, and throughout his examination as a witness, with the style of Uriah Heap, he continually made his defense playing the role of injured innocence. And while professing great friendship for the deceased, and great concern about him, and knowing as he said that he was to be foully dealt with, yet he never breathed it to anyone or tried to prevent it, when a walk of a few hundred yards would have taken him to the deputy sheriff. And Dorsey testified that deceased said that Bill Jones had gotten his money.

The appellant was found by a neighbor about sunup on the morning of the 23d of December by the side of the road, not a great way from Dr. Bridge's office, dead drunk, with his head in the ditch (where parties had been heard just before day calling his name and cursing him), and was by him helped up and taken home to his mother and put to bed. The body of the deceased was found later on the same morning, in the old vacant house. The body was badly burned and most of the clothing burned off. There was a hole burned in the floor in front of the fireplace in the shape of the letter "S." The hole extended entirely through the floor; a burned pocketbook and perhaps some other things

were found on the ground under this hole. The body when found was in the same shape as this hole letter S, but was not in the burned hole, was some three to three and one-half feet southeast from the hole, and there was a scorched or burnt place in the floor under the shoulder of the deceased where the body lay when found. As soon as the appellant sufficiently recovered from his drunken stupor to be made to understand what had taken place, he dressed himself and went down to the vacant house where the body lay, and where a large crowd of people had already assembled, and there asserted his innocence, in the face of circumstances that would have appalled a guilty man.

Hatcher and Dorsey fled the country, exhibiting the dead man's money. The former was brought back from Mississippi, tried, convicted and given a life sentence. The latter was overtaken at Fort Worth, brought back, promised and given immunity from punishment by the State, and this conviction must stand, if at all, upon the testimony of this self-confessed accomplice, murderer and assassin.

The thirty-third paragraph of the charge of the court as to conspiracy is as follows: "The court has admitted before you evidence of acts and declarations of Charley Hatcher and Paul Dorsey, upon the theory that they were coconspirators with the defendant, Jim Moore, but my action in admitting this evidence means only that sufficient evidence of the conspiracy was offered to permit the testimony to go before you, for you to determine from all the evidence whether there was in fact such conspiracy. If two or more persons enter into an agreement to commit the offense of robbery, this in law constitutes a conspiracy to commit the crime of robbery, and all parties to such agreement are conspirators. In order to constitute a conspiracy, there must be a positive agreement to commit the crime; that is, to do the act of robbery. It is not necessary for the State to prove that the parties actually met together and made the agreement to commit the offense of robbery. It is sufficient if the evidence shows that they performed different acts or parts, all contributing to the accomplishment of the common design. The agreement to commit the crime may be proved by circumstantial evidence, and to be governed by the same, unless as are described in the thirty-eighth paragraph of this charge, for determining the sufficiency and conclusiveness required in cases depending upon circumstantial evidence. The fact of conspiracy can not be proved by the declarations of any one of the conspirators, that is, except as to the one making the declaration, but when the facts or conspiracy to commit a crime have been established by competent and satisfactory evidence, the declarations and acts of any one of the coconspirators are admissible in evidence against any one of the parties to the agreement, for the purpose of establishing the commission of the crime. But to be admissible for such purpose, such acts must have been done and such declarations made during the pendency of the conspiracy, and in the furtherance of the accomplishment of the common purpose; that is, such acts must have

been performed and such declarations made after the agreement to commit the crime was entered into, and before the crime was committed."

*Chas. B. Grace, J. C. Hodges, Thos. P. Steger,* and *Dudley & Sturgeon,* for appellant, filed an able and elaborate argument and brief. *J. G. Dudley* also filed a separate argument for appellant.

*Rob't A. John,* Assistant Attorney-General, for the State.

DAVIDSON, PRESIDING JUDGE.—Appellant was convicted of murder in the second degree, and his punishment assessed at confinement in the penitentiary for a term of ninety-nine years.

The evidence is unusually voluminous. A sufficient statement of the case for the disposition of the case is in brief as follows: On the night of and preceding the homicide there was quite a crowd of people in and around a certain business house, where there was considerable drinking. Some of the parties were very much intoxicated. Deceased was drinking to a considerable extent. During the night, as contended by the State, appellant, Dorsey and Hatcher induced deceased to go with them to an outhouse for the purpose of engaging in a gambling transaction, and his money was either won by the parties or taken from him by force before his death, or taken from his body after death. Appellant's confession was admitted, over his objection, to the effect: That while at the outhouse deceased used some very insulting language towards appellant; that this brought on a personal difficulty between them, in which appellant choked deceased and struck his head against the floor; that subsequently appellant, Hatcher and Dorsey left the outhouse, leaving the deceased asleep upon the floor; that when appellant and his comrades left they went to the residence of Dr. Bridge, for the purpose of having a wound upon appellant's arm dressed; that while there he left $25 with the physician. Deceased had some $50 or $60, some of which corresponded in size with the bills that were left by appellant with Dr. Bridge. Under this confession, as well as under the statement of the accomplice Dorsey, made to Ben Hall, deceased was alive at the time they left the outhouse, where his body was subsequently found partially burned. These parties left this outhouse about 4 o'clock, arriving at the residence of the physician about 4:15 or 4:20, and remained at the doctor's office until in the neighborhood of 6 o'clock, when they left. After going a short distance, appellant became so much intoxicated that he fell into a ditch, with his heels at the top of the ditch and his head in the bottom, where he passed into a drunken sleep and stupor from which he was aroused by some of the witnesses the following morning. About 5 o'clock in the morning, as near as the witnesses could place the time, a light was seen in an outhouse where the body of deceased was subsequently found. The theory of the State was that there was a conspiracy formed by Dorsey, Hatcher and appel-

lant to secure the money from deceased, and it was in pursuance of this conspiracy that death occurred, as well as the burning of the body of deceased. If the confession of appellant be true, or be believed by the jury, it would hardly be contended that appellant did the killing especially for the purpose of robbery. This evidence was placed before the jury by the State. If, after the beating and choking of deceased by appellant, and at the time of their leaving the outhouse, deceased was alive, appellant would not be guilty of homicide under any theory of the State. If appellant beat and choked deceased, from which he subsequently died, this arose from no theory of robbery or theft of the money of deceased, and from no theory of murder in the perpetration of robbery or theft, but it grew out of a personal altercation brought about by the insulting conduct and language of deceased towards appellant. The law in regard to this state of the case was not given, but should have been. If there was a conspiracy to rob and murder deceased, or to rob or murder him, and the killing did not occur in pursuance of either phase of such conspiracy, but was the result of the fight between appellant and deceased on account of the insulting conduct mentioned above, it would very clearly suggest that appellant could not be guilty of murder in pursuance of the conspiracy to rob or murder. If in fact, or if the jury believed from the evidence, that deceased was alive at the time appellant left the outhouse, and that his death was due to any other cause than the act of defendant, he would not be guilty of any phase of homicide. These matters were suggested by the evidence and should have been distinctly charged upon by the court.

Exception was reserved to the thirty-third section of the court's charge, as being a charge upon the weight of evidence in regard to the conspiracy and the assumption of the fact that the conspiracy had been shown. This charge is in substance, and in almost exact language, the same as that for which Hudson's case was reversed at our recent Dallas term. See Hudson v. State, 43 Texas Crim. Rep., 420, 4 Texas Ct. Rep., 167. It is unnecessary to go into a discussion of this charge further than to refer to the above case.

There are other serious questions suggested for revision, but as they will not arise upon another trial as presented by this record, we pretermit a discussion of those matters. However, we would say, in regard to the motion to change the venue, that, if the testimony upon another trial is as shown by this record, we are of opinion that the venue should be changed. It is seldom the case where the testimony is stronger, tending to show prejudice against the accused, than as shown by the record here. The application for continuance may not be presented upon another trial; and if so, it will come in different form than as presented by this record.

For the errors discussed, the judgment is reversed and the cause remanded.

*Reversed and remanded.*

HENDERSON, Judge (Dissenting).—A majority of the court predicate a reversal of this case upon two propositions: (1) That the court should have given a charge to the jury in favor of appellant, predicated on his confession introduced by the State; (2) because the court's charge on conspiracy was erroneous.

The learned judge gave a charge on the theory of appellant's confession, which appears to have been overlooked in the opinion, which I think, in connection with the court's charge on the same subject, was adequate. The testimony as to appellant's participation in the homicide, it occurs to me, was overwhelming. However, the State for some purpose introduced a meager statement of appellant, the introduction of which was contested by him. This statement tended to show that the altercation arose between appellant and deceased over a game of cards, and that on deceased abusing appellant he assaulted him; but the assault, according to his statement, was not of a serious character, as when he left, which was some three or four hours afterwards, deceased was quietly sleeping on the floor. They all left and went to the village near by together. The evidence shows that here they went into a doctor's office and remained some time; the parties leaving there about daylight. This was about 6 o'clock or after, near daylight. Shortly after they left the doctor's office, Dorsey and Hatcher parted from appellant, who fell by the wayside in a drunken state. The suggestion is (not borne out by any evidence) that Hatcher and Dorsey may have gone back to the house where deceased's body was found and murdered him after this. On the other hand, the State showed by positive evidence that the murder occurred before the parties left the outhouse where the murder and robbery occurred and went to the doctor's office. Concede, however, that the statement of appellant raises the question that Dorsey and Hatcher may have returned to the outhouse about daylight, after they parted with appellant, and then robbed and murdered deceased, the charge of the court in connection with that requested on the same subject by appellant fully protected his rights. The court instructed the jury, in subdivision 37 of the charge: "If you should find that Charley Hatcher and Paul Dorsey, or either of them, unlawfully killed John Johnson, you can not convict the defendant, Jim Moore, of the homicide, unless you further believe from the evidence before you beyond a reasonable doubt, either that such killing was the result of a previously formed conspiracy between said defendant and the party who did the same, or that the defendant was present when the same was done, and knew the unlawful intent of the party who did such killing and aided such party by acts or encouraged him by words or gestures to do such killing, in such manner as to make him a principal thereto, as the term principal is herein explained." Furthermore, appellant requested the following charge, which was given: "In regard to the evidence of the confession of the defendant made to the sheriff, if you believe there was any such confession made, and you find that such confession was free and voluntarily made by the defendant

after he had been cautioned that such confession might be used against him, then you will consider the same; but if you believe that the defendant made such confession, but it is not shown to be freely and voluntarily made, or if it is shown by the evidence to have been made upon compulsion or persuasion, or under such undue influence as to extort same, then I charge you that you will reject it from your consideration in making up your verdict in this case. Should you consider such confession or declaration, then I charge you that such confession or declaration, having been introduced in evidence by the State, the whole of such confession or declaration must be taken together and so considered by the jury; and the State is bound by them, unless they are shown to be untrue by the evidence. Such confessions or declarations, if any you believe to have been made by the defendant, are to be taken into consideration, if at all, by the jury, in connection with all other facts and circumstances of the case. The State having put in evidence the statement and confession of the defendant, Jim Moore, concerning the transaction, you can not convict the defendant, unless you be satisfied beyond a reasonable doubt that the defendant's account of the affair, as stated in such confession, is not true." And again, the court gave this charge at the request of appellant: "A conspiracy can not be established by the testimony of an accomplice or accomplices alone, and in this connection I charge you that unless you believe from the evidence outside of the evidence of Paul Dorsey, and also outside of the evidence of Bill Jones, if you find that Bill Jones was also an accomplice, that there was a conspiracy to rob John Johnson, or rob and murder John Johnson, then the evidence is not sufficient to establish a conspiracy, and you can not consider any of the acts or declarations of Paul Dorsey, or any of the acts and declarations of Charley Hatcher, as to such conspiracy against the defendant in this case."

So it occurs to me, if there is anything in the so-called confession of appellant as introduced by the State, every right of appellant was amply safeguarded by the instructions given.

The opinion also declares that the charge on conspiracy as given by the court was erroneous, as being on the weight of evidence, and refers to the case of Hudson v. State, 43 Texas Crim. Rep., 420, 4 Texas Ct. Rep., 167, and pretermits any further discussion of the question. I agreed to the decision in that case, and the charge of the court there on the subject of conspiracy was similar to that given by the same learned judge on the trial of this case. In the rendition of that case we must have overlooked the opinion in Luttrell v. State, 31 Texas Crim. Rep., 493, which involves a discussion and approval of the charge here disapproved. I can do no better than simply refer to the discussion of the charge in that case, on page 506 of the opinion, as I believe the reasoning is decisive of the objections here urged. Evidently that case was overlooked, otherwise it should have been overruled. However, I believe it is good law, and shows the charge complained of is not upon

the weight of testimony, but was merely the enunciation of a correct legal principle.

I have carefully read the evidence taken on the motion for change of venue. While a number of the witnesses say that in their opinion appellant could get a fair trial in Fannin County, yet the testimony discloses that the case, on account of its enormity, became the subject of comment throughout the county; and this was intensified by the former trial of Hatcher, a coconspirator with appellant. Taking the testimony of the witnesses altogether, it occurs to me that the case should have been reversed on this ground.